<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
 3   ------------------------------------------------------------
                                  )
     Michael H. Johnson,          )   File No. 11-CV-1254
 4                                )           (PJS/JJG)
              Plaintiff,          )
 5                                )
     vs.                          )   Minneapolis, Minnesota
 6                                )   September 20, 2011
     Wells Fargo Bank, N.A.,      )   8:30 a.m.
 7                                )
              Defendant.          )
 8   ------------------------------------------------------------

 9           BEFORE THE HONORABLE PATRICK J. SCHILTZ
              UNITED STATES DISTRICT COURT JUDGE
10                       (MOTIONS HEARING)

11   APPEARANCES
      For the Plaintiff:        MORTNER LAW OFFICE
12                              MOSHE MORTNER, ESQ.
                                400 Wall St., 28th Floor
13                              New York, New York 10005

14    For the Defendant:        PETERSON, FRAM & BERGMAN, PA
                                JARED M. GOERLITZ, ESQ.
15                              55 E. 5th St., #800
                                St. Paul, Minnesota 55101
16
     Court Reporter:            DEBRA BEAUVAIS, RPR-CRR
17                              300 S. 4th St., #1005
                                Minneapolis, Minnesota 55415
18

19

20
         Proceedings recorded by mechanical stenography;
21   transcript produced by computer.

22

23

24

25
</pre>

**P R O C E E D I N G S**

**IN OPEN COURT**

1    THE CLERK:  All rise.  United States District

2    Court for the District of Minnesota is now in session, the

3    Honorable Patrick J. Schiltz presiding.

4    THE COURT:  Good morning.  Please be seated.

5    All right.  We are here today on the case of

6    Michael Johnson v. Wells Fargo Bank.  The case is Civil No.

7    11-1254.  If I could have the attorneys make their

8    appearances, please, beginning here (indicating).

9    MR. MORTNER:  Good morning, Your Honor.  Moshe

10   Mortner representing Michael Johnson.

11   THE COURT:  Good morning, Mr. Mortner.

12   MR. GOERLITZ:  Good morning, Your Honor.  Jared

13   Goerlitz on behalf of the defendant.

14   THE COURT:  Mr. Goerlitz, good morning.

15   Mr. Mortner, let me talk to you first, if I could.

16   MR. MORTNER:  Yes, Your Honor.  Shall I approach

17   the podium?

18   THE COURT:  Yeah, if you would, please.  Just let

19   me know when you're set there.

20   MR. MORTNER:  Thank you, Your Honor.  I'm ready.

21   THE COURT:  Okay.  I want to kind of get to the

22   merits of the underlying dispute first.  Let me start by

23   asking you this:  Do I understand your brief correctly that

1    you concede that if the note -- when I say "note," I mean

2    the loan.  When I say "mortgage," I mean the security

3    interest.  Okay?

4              MR. MORTNER:  Yes, Your Honor.  I understand the

5    distinction.

6              THE COURT:  Okay.  That if the note was in fact

7    transferred to the trust, to Wells Fargo, on the start-up

8    day as part of the initial batch of loans that created the

9    trust, then you wouldn't have a case, that Wells Fargo would

10   have standing to foreclose on you and essentially you

11   wouldn't have a way of blocking the foreclosure?

12             MR. MORTNER:  That is correct, Your Honor.  Of

13   course, I must state the caveat that when we say "transfer,"

14   we mean transfer in accordance with the law, which in the

15   State of Minnesota is governed by the U.C.C. Article 3.

16             THE COURT:  Okay.  And I don't know whether you'd

17   have some argument because we didn't get into the details of

18   how the loan would've been transferred, but if I understand

19   Wells Fargo correctly, they are at least alleging that this

20   loan was part of the start-up of the trust.  I don't know

21   much about real-estate law, so if I use wrong expressions,

22   forgive me, but --

23             MR. MORTNER:  At the formation.

24             THE COURT:  At the formation of the trust this was

25   part of it, that there was an exhibit that listed all the

1    loans that were part of this thing.  It's listed there as

2    part of the loans.  And I understand there is no evidence of

3    this or affidavits, but at least the indications seem to be

4    that this loan was there from the beginning.  And my

5    understanding is that you concede that unless you can find

6    something wrong with the transfer of the loan or something,

7    that essentially if they did have the loan, if they owned

8    the loan from the beginning, they would have the ability to

9    foreclose on Mr. Johnson at this point.  That part is right?

10              MR. MORTNER:  You are absolutely correct, Your

11   Honor.

12              THE COURT:  Okay.  Now, the thing that I am a

13   little concerned about, though, is I think you conceded the

14   point for maybe the wrong reason, and let me just ask you

15   about this.

16              MR. MORTNER:  Well, Your Honor, first of all, I

17   wouldn't not concede a point that's so obviously clear under

18   the law.

19              THE COURT:  Okay.  Well, I'm not sure that --

20   well, let me get --

21              MR. MORTNER:  Go ahead, Your Honor.

22              THE COURT:  I think you're right, but you may be

23   right for a different reason.

24              MR. MORTNER:  Okay.

25              THE COURT:  As I understand your reason for

1    conceding this point, that you say that -- in fact, let me

2    just find your language.  This would be -- you, in your

3    brief, you know, had the four examples; first, second,

4    third, fourth.

5              MR. MORTNER:  That's in the reply brief.

6              THE COURT:  In the reply brief, yeah.  There are

7    three briefs from each of you, so one of the briefs.

8              And you say -- this is on page 7 of the reply

9    brief, I believe -- that would be -- the situation I just

10   gave you would be your second there:  The foreclosing

11   entity, Wells Fargo, has a legal assignment of the note but

12   no assignment of the mortgage security instrument.  Under

13   these circumstances, the foreclosing entity, Wells Fargo,

14   would still have an interest in the mortgage loan and

15   standing to foreclose, because the court in *Jackson* held

16   that a legal assignment of the promissory note with no

17   accompanying assignment of the security instrument

18   constitutes an equitable assignment of the security

19   instrument that meets the requirements necessary to commence

20   a foreclosure.

21             What puzzles me about this is I read *Jackson*

22   exactly the opposite.  *Jackson* said, and I'm going to quote

23   you one sentence from *Jackson* --

24             MR. MORTNER:  Okay.

25             THE COURT:  -- "Our precedent also establishes

1    that in order to foreclose by advertisement, both record and

2    legal title" -- three kinds; equitable, record, and legal --

3    "both record and legal title must concur and coexist at the

4    same time in the same person or persons who alone have the

5    authority to foreclose the mortgage regardless of other

6    equitable interest vested in third parties."  It seems to me

7    *Jackson* is saying pretty clearly that you must have record

8    and legal title to foreclose.  Having an equitable interest

9    in the mortgage does not give you standing to foreclose.  So

10   the reason you conceded the point I don't think is correct

11   under Minnesota, but --

12            MR. MORTNER:  All right, Your Honor.  I mean, I

13   hear your -- I'm sorry.  Did I cut you off?

14            THE COURT:  No.  No.  Go ahead.

15            MR. MORTNER:  Certainly in my home state of New

16   York, the courts have held very clearly that the note and

17   the collateral instrument must travel together and that a

18   foreclosing party must have legal assignment of both.

19            I believe that what *Jackson* did in the State of

20   Minnesota was that it said that if the foreclosing party has

21   legal title of the note and they don't have the actual

22   possession -- legal title assignment, if you will -- of the

23   collateral instrument that the court would through operation

24   of equitable principles allow them nonetheless to foreclose

25   as though they had the collateral instrument.

1      THE COURT:  I didn't see that in *Jackson*.  In

2   fact, I saw the contrary.  What *Jackson* says is that you --

3   remember in *Jackson* it's MERS who's doing the foreclosing.

4   MERS has the legal title.  MERS does not have an equitable

5   interest in --

6      MR. MORTNER:  Well, actually, courts have held

7   that MERS doesn't have legal title.  Its title is by virtue

8   as nominee.  That's why many courts throughout the land have

9   held that an assignment from MERS is invalid, because it's a

10  nominee and it's not the title holder.

11     THE COURT:  Well, I've got to hang on --

12     MR. MORTNER:  I don't know, maybe we're getting

13  off on a --

14     THE COURT:  No, I just want to stick with

15  Minnesota law.  It's hard enough for me.  This is a murky

16  area of the law.  I always feel like I'm getting in a time

17  machine and traveling back 150 years when I'm doing these

18  mortgage cases.  It's one area of the law where two-thirds

19  of the cases cited to me by the parties are 100 years old or

20  more.

21     What I understood *Jackson* to be saying is that,

22  first of all, you have to split the note from the mortgage.

23  And with respect to the mortgage, there's three types of

24  interests in the mortgage.  There is the equitable interest

25  in the mortgage.  There's the person who holds the legal

1    title to the mortgage.  And then there is the record title

2    holder, who is down on the --

3            MR. MORTNER:  Well, now, when you say "the

4    equitable interest in the mortgage," are you referring to

5    the collateral instrument or to the note?

6            THE COURT:  I'm referring to the collateral

7    instrument only now.  Okay?

8            MR. MORTNER:  Okay.  Yeah.

9            THE COURT:  What MERS said essentially in

10   Minnesota is that you can distinguish between the entity

11   that holds legal title to the mortgage, and in *Jackson* that

12   was MERS according to the Minnesota Supreme Court, and the

13   entity that has an equitable interest in the mortgage, which

14   in *Jackson* was whoever the lenders were.

15           But the Minnesota Supreme Court said in order to

16   foreclose, you have to have legal title and record title,

17   and that's why it was MERS doing the foreclosing in *Jackson*,

18   because MERS was the one that had the legal title and the

19   record title.  I assume that's why in this case MERS

20   assigned the legal title to Wells Fargo, because Wells Fargo

21   couldn't come in here and foreclose without legal title.

22   And I assume that's also why the assignment was recorded,

23   because Wells couldn't be here and foreclose without the

24   record title.

25           MR. MORTNER:  Uh-huh.

1          THE COURT:  So, again, what I'm getting back to is

2     the fact that the concession you made seems to me -- unless

3     I'm missing something -- seems to be based on a

4     misunderstanding of Minnesota law.

5          I don't think Wells would have had standing to

6     foreclose the Johnson mortgage if it had just received the

7     note and not received legal title to the mortgage and not

8     also been recorded as the legal title holder to the

9     mortgage.

10          MR. MORTNER:  Okay, Your Honor.

11          THE COURT:  Okay.  Now, next point:  I still think

12     your concession might be right because I'm not sure what in

13     the -- if this transaction unfolded as Wells alleges -- that

14     is, at the start-up of the trust it received the note; and

15     it received the equitable interest in the mortgage, which

16     follows the note in Minnesota, your equitable rights in the

17     mortgage follow the note in Minnesota, but it left legal

18     title in MERS and then later MERS assigns the legal title to

19     Wells when Wells is preparing to foreclose, would that

20     violate the terms of the trust agreement in your view?  If

21     those facts are as Wells alleges, would that violate the

22     terms of the trust agreement?

23          MR. MORTNER:  I think that in order to answer your

24     question correctly we need to distinguish between what the

25     trust considers possession of an asset and what the courts

1    consider the right to foreclose.

2         So to answer your question, according to the trust

3    agreement, possession of an asset must be acquired at the

4    time of start-up or with exceptions.

5         THE COURT:  So that's what I was wondering,

6    because I know less about trust law than I know about

7    mortgage law.

8         MR. MORTNER:  Your Honor, I want to give you the

9    most correct answer I can because --

10        THE COURT:  And maybe you don't know.  I'm just

11   looking for the actual language of the trust agreement on

12   which you rely.

13        MR. MORTNER:  Well, that would be --

14        THE COURT:  It says it shall not acquire any

15   assets for any REMIC -- I don't know how they say it --

16        MR. MORTNER:  REMIC, yeah.

17        THE COURT:  -- if it would result -- unless the

18   counsel says it won't result in an adverse REMIC event.

19        MR. MORTNER:  Yes, Your Honor.  That would be

20   Section 10.02?

21        THE COURT:  Right.  So on the facts of this case

22   as posited by Wells Fargo -- I'm not asking you to agree at

23   this point, but just assuming that what Wells Fargo said is

24   true.  So on the start-up day the trust has the loan and,

25   therefore, an equitable interest in the mortgage.  Legal

1    title is left in MERS.  February of 2001 MERS assigns the

2    legal title and it's recorded so that Wells Fargo can

3    foreclose.  Would that be a prohibited transaction under the

4    trust?

5           MR. MORTNER:  I think not, Your Honor.

6           THE COURT:  It seems to me it would be hard to say

7    it would be since, first of all, the whole trust in the way

8    it distinguishes between MERS mortgages and non-MERS

9    mortgages seems to contemplate exactly this kind of thing

10   going on.

11          And also it would be hard if you already own the

12   equitable interest in the trust and you are basically just

13   getting -- it would be like if you already own the car and

14   it was your possession, everybody agrees you own it and the

15   former owner was merely going through the formality of

16   transferring the title to you, I doubt that would be

17   acquiring an asset.  It would be acquiring proof of an asset

18   you already acquired.

19          MR. MORTNER:  Yeah.  I guess what the ultimate

20   question would be to take it a step further, Your Honor, is

21   would such a late acquisition in that fact scenario, where

22   they already had possession of the note, would that

23   constitute a negative REMIC event under the Internal Revenue

24   Code.

25          THE COURT:  Yeah, well, now we're in tax law,

 1    which joins trust law and mortgage law.

 2         MR. MORTNER:  That's what makes it so interesting.

 3         THE COURT:  "Interesting" is one way to phrase it.

 4    It's at least an area where I'm not --

 5         But it seems to me that the motions you have

 6    before me now involve a lot of jousting about the procedural

 7    posture and who has to come forward with what and so on.  My

 8    main interest at the end of the day is what's the right

 9    answer to the underlying question.

10         MR. MORTNER:  Yes, Your Honor.

11         THE COURT:  I mean, if the facts are as Wells

12    Fargo alleges, and it seems like they probably will be shown

13    to be -- I'm not foreclosing you from coming up with

14    something, but if the facts are as they say, I'd be

15    surprised if this violated the trust agreement or was void

16    under New York law or would create an adverse event under

17    the tax code, but I don't know.

18         As I say, the whole trust agreement -- and

19    certainly they obviously -- lots of lawyers worked on this

20    thing.  I'm sure that there's like a master out there and

21    people borrow from it, but I'd be surprised -- I mean, MERS

22    mortgages are -- everybody knows what they are and there's

23    tons of litigation.  It looks like the trust agreement was

24    set up contemplating exactly this kind of a transaction.

25         MR. MORTNER:  Actually, Your Honor, I think the

1    trust agreements were set up in order to shield investors

2    from double taxation, and I don't think they contemplated

3    this particular situation; had they done so, they would've

4    followed the dictates of the UCC.

5            What they were concerned with was that the IRS

6    shouldn't be able to come in and say, hey, you've got some

7    late mortgages, we're going to take away your pass-through

8    status in the REMIC, and you're going to get taxed at the

9    REMIC level and at the investor level.  So having created an

10   instrument to prevent that by saying that any late-acquired

11   mortgages will be void, therefore, the IRS comes to us and

12   says, hey, late-acquired mortgage, nope, it's a void

13   transaction, we're safe.  Investors are safe.  And I think

14   that's what they had in mind.  But, unfortunately, they have

15   to be bound by that for their sake.  They have to be bound

16   by those same provisions when it cuts the other way, when

17   they do have a late-acquired asset and they can't now say

18   it's not void as they would've liked to say when it's the

19   IRS claiming it.

20           THE COURT:  But our question is whether if you at

21   start-up take the loan and take the equitable interest in

22   the mortgage, leaving only legal title to MERS, and then

23   four years after start-up you have MERS transfer that legal

24   title to you whether that is an asset that is acquired by

25   the trust or whether that would be, whatever it's called, an

1    adverse REMIC event.

2            MR. MORTNER:  Yep.

3            THE COURT:  I'm thinking probably not, but I can't

4    say I know at this point.  It's not something that you all

5    involved me in.

6            MR. MORTNER:  Your Honor, initially we focused on

7    the event of the late assignment of the mortgage because it

8    seemed to us that that was going to be the basis of Wells

9    Fargo's argument in part because of the timing of the

10   events.  The assignment was made in February and on March

11   9th, 2010 they --

12           THE COURT:  2011.

13           MR. MORTNER:  -- 2011 they recorded the assignment

14   and on the same date they served the notice of foreclosure.

15   It seems like that was the case.

16           But getting to the question then -- I just want to

17   address one other point, if you will, Your Honor.  I'm sure

18   Mr. Goerlitz can speak to this, but, as I recall, Wells

19   Fargo has not alleged that there was an actual transfer of

20   the note at start-up.  What I think they said was that there

21   was a blank endorsement and that that transferred the note.

22   And I address that in my argument, when you're ready to hear

23   that, as to why that's totally insufficient under the UCC to

24   constitute a transfer.

25           THE COURT:  Is that in your briefs?  I don't

1     remember that.

2                 MR. MORTNER:  Yes, Your Honor.  Yes, Your Honor.

3                 THE COURT:  I easily could've missed it in the

4     thing.

5                 MR. MORTNER:  That's okay.  Well, it arose in the

6     -- as I recall, if I can direct the Court, I believe I made

7     that argument in response to the opposition to the motion

8     for summary judgment in my reply -- yes, in the reply brief.

9     That would be Document 23 under the ECF.  Would you like me

10    to speak on that?

11                THE COURT:  It seems to me that the posture this

12    case is in essentially is that you both seem to agree that

13    ultimately the status of this note is what's going to be

14    determinative in the sense that Wells Fargo I don't

15    understand to be contesting that if it didn't acquire the

16    note at the start-up.  If the first time it got any legal

17    interest in the Johnson mortgage was in February of 2011,

18    then that would have violated the trust agreement.

19                Now, Wells Fargo has other arguments, like --

20                MR. MORTNER:  I think that is absolutely correct,

21    Your Honor.  That is my understanding of the --

22                THE COURT:  And at the same time you seem to be

23    conceding, or at least not contesting, that if Wells Fargo

24    did get that loan at start-up, that probably what happened

25    in February of 2011 didn't violate the trust agreement.

1          MR. MORTNER:  I think that's right, Your Honor.

2          THE COURT:  Okay.  But what we don't have in the

3     record right now is any admissible evidence about the loan,

4     which is the crucial thing.  We have this finger pointing

5     about whose job it is, blah, blah, blah.  At the end of the

6     day, though, I suspect my decision is going to be we need to

7     hear about the loan.  It seems like you could do a very

8     quick discovery on this and get the facts as to what exactly

9     happened with respect to the loan.  And then you could make

10    your argument about the UCC, if you still wanted to, and

11    they could respond.  We're in this very weird procedural

12    posture because of the way the case unfolded and --

13         MR. MORTNER:  Yes and no.

14         THE COURT:  -- it's not anybody's fault, but we

15    are.

16         MR. MORTNER:  I don't quite agree with you on this

17    point, Your Honor.  If I may, I will explain why.

18         THE COURT:  Sure.

19         MR. MORTNER:  Let's first start with what does

20    Wells Fargo contend.  They contend that the note was

21    transferred by a blank endorsement.  Now, on a Rule 56

22    motion we have to look to the substantive law of the state.

23    Here we would be looking, therefore, at the Uniform

24    Commercial Code of the State of Minnesota, Article 3, which

25    governs negotiable instruments.  So we're dealing here with

1    what constitutes a legal transfer of a note.

2          They say the note was transferred and that it was

3    a blank endorsement.  We have two kinds of endorsements.  We

4    have special endorsements and we have blank endorsements.

5    Just very simply a special endorsement says paid to the

6    order of Wells Fargo.

7          THE COURT:  Yeah, and a blank is paid to bearer,

8    right.

9          MR. MORTNER:  Correct.  So what the UCC says is

10   that in both cases, but most certainly in the case of a

11   blank endorsement, there are two elements to establish

12   negotiation.  And, Your Honor, I'm referring to Minnesota

13   Statute 336.3201, transfer of possession, whether voluntary

14   or involuntary, of an instrument by a person other than the

15   issuer to a person that is to say by the bank, the issuer is

16   Mr. Johnson, other than the issuer to a person who thereby

17   becomes its holder.  If an instrument is payable to an

18   identified person, which would be a special endorsement,

19   negotiation requires transfer of possession of the

20   instrument and its endorsement by the holder.  If an

21   instrument is payable to bearer, it must be negotiated by

22   transfer of possession alone.

23          THE COURT:  Yeah, the physical copy of the note.

24          MR. MORTNER:  They have to have it.  What kind of

25   discovery do we need here?  Rule 56(e)(2), we've established

1    a prima facie case that they have no standing.  If you've

2    got the note, bring it in.  There's a little more than that.

3    They would have to show --

4           THE COURT:  I wish that Mr. Goerlitz had just

5    moved for summary judgment and given us an affidavit and

6    given us a note.  Instead, we have these odd arguments about

7    what you needed to allege and what was their job to allege.

8    Like I said, we have a very nice, clean issue here once you

9    guys tee it up.  It just hasn't been teed up.  Instead, we

10   have this standing issue where they allege you don't have

11   standing to be complaining about this, which we'll address.

12   I don't know physically who possesses the notes.  But

13   Mr. Goerlitz hasn't moved for summary judgment and so that's

14   why he hasn't come up with the note.  I assume if he had

15   moved for summary judgment, he would have told us something.

16          MR. MORTNER:  No, in opposition to my argument

17   under 56(e)(2), which is the argument that says the burden

18   of proof shifts to the non-movant --

19          THE COURT:  But here's the problem:  You confuse

20   both Wells Fargo and me with what kind of motion you were

21   bringing.  Wells briefs your motion as though it's a motion

22   for judgment on the pleadings.  A motion for judgment on the

23   pleadings focuses only on the four corners of the pleadings,

24   doesn't get into affidavits and things.  Rule 56 only

25   applies to summary-judgment motions.  And your motion is

1    docketed as First Motion For Preliminary Injunction and

2    Judgment on the Pleadings.  Your motion is captioned,

3    "Plaintiff's Motion For Judgment on the Pleadings."  Your

4    notice of hearing is docketed and captioned, "Judgment on

5    the Pleadings."  The first sentence of your memorandum is,

6    "Plaintiff Michael Johnson respectfully submits the

7    following memorandum in support of his motion for judgment

8    on the pleadings."  Now, elsewhere you also say summary

9    judgment, but you have both there.  But the caption of the

10   motion, the docketing of the motion was all as a motion for

11   judgment on the pleadings.  Rule 56 doesn't require anybody

12   to come forward with any proof to defeat a motion for

13   judgment on the pleadings.  In fact, we only look at the

14   face of the pleadings.  So I can't grant summary judgment

15   against Wells when, for one thing, if there's confusion as

16   to what kind of motion you were bringing.

17          Also, to deny Wells's motion to dismiss your

18   complaint, I think it's probably -- that Wells is probably

19   wrong that you had some obligation to make affirmative

20   allegations about the note in your complaint.  That's really

21   their defense to your claim.  You don't have to allege facts

22   to negate an anticipated or even unanticipated defense.

23          MR. MORTNER:  Yes, Your Honor.

24          THE COURT:  But for me to grant you summary

25   judgment (sic), I would have to say that you are entitled to

1   judgment as a matter of law -- or, I'm sorry, to grant you

2   judgment on the pleadings, I'd have to say you're entitled

3   to judgment as a matter of law on the pleadings.  The

4   pleadings include their allegations that they did get the

5   note at the start-up of the trust, and the pleadings include

6   the trust agreement which clearly contemplates the legal

7   title to MERS mortgages remaining with MERS.  I don't think

8   I'm at the point that I can grant you either judgment on the

9   pleadings or summary judgment.

10       I think you folks need to take about a month of

11  discovery, tee this up correctly, and we can decide the

12  issue or it may even go away if you get satisfactory proof

13  that they got a physical copy of the note at the start-up.

14       MR. MORTNER:  It would require physical copy, plus

15  some sort of additional evidence of the transaction itself,

16  an affidavit of an officer saying that they received

17  possession of it.

18       THE COURT:  Yeah, and they may.  I don't know if

19  they have got that or not.

20       MR. MORTNER:  But, Your Honor, we did have Rule 26

21  disclosure in this case and none of that evidence was

22  provided, and it would have been essential under Rule 26.

23       THE COURT:  Well, all I'm saying, Mr. Mortner, is

24  it's obvious the status of the note is critical; when, if

25  ever, the note was transferred, how the note was

1    transferred.  And I need a record on that.  And then I need

2    a nice, clean argument on given that this is what the facts

3    are about the note, your argument that it wasn't effectively

4    transferred to the trust and therefore the first time the

5    trust got any interest in this was in February of 2011,

6    which was a prohibited transaction, which is void under New

7    York law, and I follow that.

8            Now, I just flag something else for you that you

9    should look at.  There is a California bankruptcy case.  The

10   case is called *In Re:  Doble*, D-O-B-L-E.

11           MR. MORTNER:  I am very familiar with that case.

12           THE COURT:  I didn't read it, my law clerk did.

13   He just told me late yesterday that it seems to hold that

14   this New York trust law that you are relying upon doesn't

15   apply to business-related trusts.

16           MR. MORTNER:  It's an interesting case because the

17   judge was coming out -- with all due respect to her, she

18   came out of left field with that one because she then cites

19   law from another state.  I think she cites --

20           THE COURT:  My law clerk said he wasn't terribly

21   convinced by the analysis.

22           MR. MORTNER:  I think she cites, like, an Iowa

23   case in support of her findings about New York law.  I mean,

24   it's really weird.  I have no problem -- I don't think it's

25   a case Your Honor would want to follow, and I'd be happy to

1    show you why.

2              THE COURT:  It may be.  I just wanted to flag it.

3    I haven't read it because I knew I wouldn't have to get to

4    it for today's purposes.  My law clerk was looking around at

5    the related law.

6              MR. MORTNER:  Good law clerk, Judge.

7              THE COURT:  It's something that maybe Wells will

8    raise.

9              All right.  One other thing.  I just made a note

10   to myself, and this is totally an aside.  Your brief keeps

11   quoting the outdated versions of the Rules of Civil

12   Procedure.  The Federal Rules of Civil Procedure -- it's

13   called restyled -- they were completely rewritten in 2007.

14   Your briefing keeps quoting the pre-2007.  Like I think you

15   rely a lot on 56(e)(2), which exists now, but it isn't the

16   same thing anymore.  So I'm just letting you know that it's

17   time to get yourself a new copy of the Federal Rules of

18   Civil Procedure.

19             MR. MORTNER:  Thanks, Judge.  That's embarrassing.

20             THE COURT:  It was a restyling, meaning it didn't

21   change anything substantively.  So the substantive

22   requirements you are relying on are still in the rules, but

23   you want to quote the language.

24             MR. MORTNER:  Well, thank you, Judge.  Thank you.

25             THE COURT:  Let me just see if I have other

1    questions for you on this and then I'm going to ask you

2    about a couple other matters.  Just give me one second to

3    look at my notes here.

4         Okay.  On the standing issue -- mostly I want to

5    ask Wells Fargo about the standing issue.  On the other

6    issues I think it will probably work best if I talk to Wells

7    first, and then I will have you back up if you have more to

8    say.

9         Let me just ask you out of curiosity.  It's odd to

10   see a New York lawyer coming in on one of these local

11   mortgage cases.  You don't have to tell me this if there's

12   something confidential, I'm just curious as to how you ended

13   up in a Minnesota mortgage case.

14        MR. MORTNER:  Your Honor, I have a wonderful

15   client, Mr. Johnson.  He works as a fire sprinkler

16   inspector.  I don't know if you are a baseball fan, but I

17   had represented Lenny Dykstra in the United States

18   Bankruptcy Court specifically with a single issue as to the

19   predatory loan that had been issued by Chase when he

20   purchased Wayne Gretzky's house.  Lenny was on the radio,

21   national programming, saying nice things about me.

22   Mr. Johnson calls me up and he says, I'm bringing you out

23   here.

24        THE COURT:  Oh, okay.  It was just an unusual

25   connection.

1          MR. MORTNER:  I said I don't know if you can -- he

2    is a great guy.  He really believes in the law.  He says, I

3    want to have you out here.

4          THE COURT:  All right.  Well, you're more than

5    welcome.  I just was curious.  Usually these mortgage cases

6    there's kind of a local bar here and usually the same dozen

7    lawyers you see on either side of the case.  I just haven't

8    seen a New York lawyer come in before.  You are very

9    welcome.  All right.

10          MR. MORTNER:  Pleasure to be here.  Thank you,

11   Your Honor.

12          THE COURT:  I will talk to Mr. Goerlitz.

13          Mr. Goerlitz.

14          MR. GOERLITZ:  Thank you, Your Honor.

15          THE COURT:  Let's talk about the merits first, the

16   same thing I was talking to Mr. Mortner about.  Is your

17   understanding of Minnesota law the same as mine, which is

18   that only the holder of legal title, which also has to be

19   record title, can foreclose --

20          MR. GOERLITZ:  It absolutely is, Your Honor.

21          THE COURT:  -- at least by advertisement?  I

22   assume that if the holder of the equitable interest in the

23   mortgage wanted to foreclose, they'd have to do it through

24   judicial proceeding.  I assume they might have some way to

25   do it, but they couldn't do it through advertisement.

1          MR. GOERLITZ:  Sure.  It's kind of an interesting

2     mess, you could say, and one that I don't think the

3     Minnesota Supreme Court really got into in *Jackson v. MERS*.

4     What is legal title to foreclose?  I think we know as much

5     that MERS had legal title in that case to foreclose.  It,

6     obviously, had record title.  But if you look at the

7     definition of legal title, it says that it's apparent

8     ownership, which, in my opinion, leaves open the question

9     that you could leave record title in the name of whoever and

10    whoever is the underlying rights holders of the debt with

11    the equitable interest could tell anybody to foreclose in

12    their name; MERS, myself, the Court, whoever, you can go

13    ahead and foreclose.  The issue becomes then in the context

14    of foreclosure law do they really have legal title to

15    foreclose?  Are they being authorized by the equitable

16    interest to foreclose?  And that's the big unknown question

17    there, and that's why --

18          THE COURT:  It's an interesting question.  So we

19    know who has equitable title.  That's the owner of the loan

20    that the mortgage secures.  We know who has record title.

21    That's the person whose name appears down in the county

22    records.

23          MR. GOERLITZ:  Right.

24          THE COURT:  Yeah.  It is a little unclear from

25    *Jackson* what legal title is if it's not the person whose

1      name is on the books and it's not the person who has the

2      loan what the legal title is.  They clearly thought MERS had

3      it in *Jackson*.

4              MR. GOERLITZ:  And I think that's because of the

5      MERS system tracking the loans and there being a specific

6      indication under their system of who has the right then to

7      enforce or authorize MERS to foreclose in its name.

8              Basically what lenders have done in response to

9      the MERS litigation is say we're just not going to foreclose

10     in the name of MERS.  We're going to foreclose in a party

11     specifically with legal title to foreclose.  Now, that might

12     be the actual owner of the debt and it might not, because

13     Fannie Mae never forecloses in its name.  You never see a

14     name in the foreclosure of them or Freddie Mac.  You always

15     see it in the name of somebody else, which generally is the

16     servicer foreclosing in its name on behalf of Fannie Mae and

17     Freddie Mac.

18             THE COURT:  In this case to avoid those questions,

19     you have Wells taking the assignment and recording it.  So

20     you have Wells by March of 2011 being the record title

21     holder, the legal title holder, and the equitable title.  So

22     we have all that in Wells.  But then just as you close one

23     set of arguments you open these arguments about the trust

24     agreement.

25             Now, you never really address this directly -- you

1    didn't really have to -- but if for some reason you did not

2    legally acquire the loan back at the start-up date, would

3    you agree with Mr. Mortner's -- or let me put it

4    differently.  If you didn't acquire anything, any kind of

5    equitable or legal rights with respect to the Johnson

6    mortgage until February of 2011, would you agree that that

7    would have been a prohibited transaction under the trust

8    agreement?

9           MR. GOERLITZ:  I agree it would be a problem and

10    one that would have to be flushed out.  I think Mr. Mortner

11    himself agrees that there can be transactions after that

12    start-up date.  You just need to follow certain procedures

13    in order to make that authorized transaction.

14           THE COURT:  They can't create an adverse event.

15    They can't be adverse REMIC events.

16           MR. GOERLITZ:  Right.  I think the idea is, for

17    example, if you have a bad asset, a foreclosed asset, you

18    could maybe shuffle assets in and out, but you have to

19    follow certain procedures under trust law and tax law in

20    order for that to not trigger certain problems.

21           THE COURT:  But those would not have been followed

22    with respect to this because it looks like the people who

23    were undertaking this transaction in February of 2011

24    assumed that the loan had been part of the initial batch of

25    loans, right?

1          MR. GOERLITZ:  And you're correct, Your Honor.

2          I kind of want to back up because it seems like

3     the Court's main concern here with our motion to dismiss is

4     that it seems to be troubled by granting that motion and

5     penalizing the plaintiff for leaving out any allegations to

6     the note, and that was completely --

7          THE COURT:  Well, just to be clear what my

8     position is, I may very well grant your motion and make

9     Mr. Mortner file -- I wouldn't dismiss the case with

10    prejudice.  We never dismiss the cases with prejudice on

11    *Iqbal* motions this early in the lawsuit.  I would simply

12    have him replead.

13         We're going to get to this loan issue one way or

14    the other, which is why I'm asking you about it.  The

15    quicker -- you know, we have six briefs, and a hearing, and

16    a day of my time to get ready for the hearing, and it seems

17    to me we're just shuffling cards here.  We're eventually

18    going to have to get to this question of the loan and that's

19    why I'm asking about it.

20         MR. GOERLITZ:  Correct.  Correct.  What troubles

21    me is the position -- I think the Court was correct earlier

22    that we've had no obligation to present any of this evidence

23    to the Court yet.

24         I think, more importantly, this case has been

25    going on for a number of months and the plaintiffs haven't

1    provided any sort of discovery or record to the Court that

2    we don't have any of this information all of it which they

3    could've very well have provided, such as a request for the

4    original note and the like.  I think we're getting outside

5    the record.

6              THE COURT:  See, I get impatient with this sort of

7    fighting.  What I would love to have happen is the two of

8    you just to talk after we're done here today and just agree

9    on how you're going to get them the information about the

10   note; a copy of the note, who had a copy of the note, how

11   was the note transferred, what does the note say.  This is

12   all something we can -- both of you have an obligation, not

13   just to me but to your clients, to try to get this thing

14   resolved as efficiently as we can.  You're two reasonable

15   people.  Get together.  Figure out how you're going to get

16   the information about the note.  I assume it's going to all

17   be uncontested.  The basic facts are going to be

18   uncontested.  We can easily make a record as to exactly

19   everything that's relevant to the note and then we can have

20   these arguments about the UCC and the trust agreement.  That

21   doesn't mean that your point isn't right or wrong, but at

22   this point in the litigation no judge would ever dismiss

23   this lawsuit with prejudice.  The most any judge is going to

24   do is ask Mr. Mortner to refile his complaint, and we're

25   going to be right back at square one.  I'd like to cut threw

1    a lot of this, and let's quickly get the record assembled on

2    the loan.  Mr. Mortner may drop his lawsuit at that point.

3    He has acknowledged that if certain facts alleged by Wells

4    are true -- or if certain facts are true, I should say; if

5    in fact you got physical possession of the note at the

6    start-up date, it sounds like he agrees that his lawsuit

7    probably has no merit.  But so if that's true, I assume that

8    that's going to be your position that you did take

9    possession of the note or maybe you have a different

10   interpretation of the UCC, but let's just cut to it.

11            MR. GOERLITZ:  And my point, Your Honor, is I have

12   the original note.  There's no request been made.  I'm just

13   making the point I disagree with his assertion that we

14   aren't providing anything.  It hasn't been requested.  It's

15   all there.  We want an order of this Court that says you

16   can't just rely upon the mortgage.  That's what we want,

17   because we get these cases where they look at the assignment

18   of mortgage and they say your whole securitization process

19   is a house of cards, this was six years later or three years

20   later after the loan was securitized, you can't foreclose.

21   Our point is you need more than just the assignment of

22   mortgage.  You can allege that and get all that information.

23   But this is a hot bed argument across the nation and we're

24   looking from an order from this Court that says you cannot

25   solely plead an allegation regarding the assignment of the

1     mortgage without addressing the debt in order to have a

2     plausible argument.  Whether the Court wants to dismiss it

3     with or without prejudice I'm not going to disagree with.

4     That's, I think, a judgment call at the court level.  But

5     our perspective is, and this was a calculated attempt, lock

6     in the complaint so they don't do a later amendment just by

7     virtue of the motion to dismiss and seek an order that says

8     this complaint does not create a plausible argument because

9     it solely relies upon the mortgage, you need more than that,

10    and that's what we're seeking.

11         THE COURT:  I think your argument is one that you

12    could get reasonable judges to go either way on.  My

13    reaction is this:  In Minnesota, as I said, the law is clear

14    that you have to have record and legal title to foreclose.

15    And, again, this is a lawsuit to enjoin a foreclosure.  So

16    what matters in this lawsuit is who has legal and record

17    title to the mortgage.  Okay?  The plaintiff has alleged

18    that you didn't get legal title until February 1st of 2011

19    essentially.  He is not using these words, but that's

20    essentially what he is arguing.  He has also alleged that

21    your acquisition of legal title on February 1st of 2011 was

22    unlawful under the trust agreement and therefore void under

23    New York law.  So I'm not sure he needs to say much more

24    than that.  You know, I'm filling in a little bit here, but

25    basically in Minnesota you need legal title to foreclose.

1    Wells didn't get legal title until February of 2011.

2    Acquiring legal title in February of 2011 violated the trust

3    agreement because it bars acquisition of assets after the

4    start-up date, I'm paraphrasing, blah, blah, blah.

5            Now, your response is, no -- I mean, you don't

6    disagree with point one, and you don't disagree with point

7    two.  You do need legal title and you did get legal title on

8    February 11th and not until February 11th.

9            With respect to point three, you disagree saying

10   our acquiring legal title on February 11th did not violate

11   the trust agreement because we had earlier acquired

12   equitable title when we got the loan at the start-up date

13   and this kind of arrangement is specifically envisioned by

14   the trust agreement and so on.  That strikes me more as your

15   defense to their claim.  And it's always a very difficult

16   line to draw, and it's part of the problem with *Iqbal* and

17   *Twombly* talking about plausibility.  It almost makes these

18   mini summary-judgment motions.  Generally, the plaintiff

19   just has to tell you their claim.  Their claim is you didn't

20   get legal title until February of 2011, that violated the

21   trust agreement, it's unlawful under New York law and,

22   therefore, you never got legal title and you can't foreclose

23   on me.

24            MR. GOERLITZ:  Can I interject?

25            THE COURT:  Yes.

1          MR. GOERLITZ:  Your Honor, we allege we've always

2     had legal title; in fact, that's what *Jackson v. MERS* held.

3     I think what we did, for the purposes of clarification, was

4     transfer that legal title to the trust.  But our allegation

5     is we could've foreclosed in the name of MERS and merely by

6     doing that assignment of mortgage changes nothing under the

7     law.

8          THE COURT:  Well, that's a different argument.  I

9     don't have any idea what that argument means.  *Jackson* has a

10    situation that is our situation pre-February 1st of 2011.

11    The title is in MERS's name.  It's recorded in MERS's name.

12    Somebody else owns the loan.  The Minnesota Supreme Court

13    said that it was MERS that had legal title.  I mean, that's

14    clear from *Jackson*.  So before February 1st of 2011, it

15    appears to me that under *Jackson* MERS held the legal title.

16    Wells Fargo/the trust -- I don't know how you distinguish

17    the two because it's Wells Fargo as trustee -- held the

18    loan, you say, and held the equitable title.  As I read

19    *Jackson*, I don't think you could have foreclosed in your own

20    name by advertisement.  I think you either would have had to

21    use a judicial proceeding or you would have had to direct

22    MERS to do it or MERS would have had to foreclose on your

23    behalf.  But we're getting back to the pleading issue.

24          I think they have pled their theory.  Your

25    argument strikes me as a defense to their theory.  It's an

1    argument for why they're wrong.  I'm not sure that they have

2    to plead it in their complaint.  As I say, it's always a

3    close issue as to -- your argument is basically this kind of

4    a complaint isn't plausible unless they have accounted for

5    the loan in the complaint, and that could be right.  My

6    reaction is more that they've laid out their theory for you.

7    And plaintiffs' theories are wrong lots in complaints, and

8    then you move for judgment on the pleadings or you move for

9    summary judgment and you win because they're wrong.  It

10   isn't a pleading issue.  It isn't an *Iqbal* issue.  It's a

11   they're wrong issue.

12        I think where you are right about the Rule 8

13   problem is when they tell you that the assignment in 2011

14   was a prohibited transaction under the trust agreement with

15   no indication as to why.  And it isn't enough to attach a

16   287-page agreement and say go look in there and you will

17   find out what we mean.  I think that that's probably true.

18   If you want, I can make Mr. Mortner explain more thoroughly

19   his theory as to why, but you know the theory now.  I'm not

20   sure whether that would do any of us any good.  It's up to

21   you.

22        MR. GOERLITZ:  Sure.  My concern, you know, again,

23   I think we agree on the deficiencies in the pleading.  Of

24   course, we would love for the Court on that pleading to

25   dismiss it with prejudice.  It sounds like the Court is not

1    inclined to do that.  So if the Court is not inclined to do

2    that, I think then there's only limited discovery here, you

3    know, relative to that issue.  Like I said, we're ready, and

4    willing, and able to address that issue.

5         THE COURT:  If you've got the note, if you've got

6    a physical copy of the note back at the time that the trust

7    was created, it sounds to me like you are not going to have

8    a lot of trouble winning this lawsuit.  I'd like to cut to

9    the chase.  Let's get that done, and let's get the lawsuit

10   resolved, rather than have the procedural arguing.

11        Let me ask you, because this is an issue that

12   doesn't go away no matter what happens, and that's this

13   question of standing.  I know that that is you're saying

14   that essentially it's kind of none of Mr. Johnson's

15   business, this between MERS, and Wells Fargo, and the

16   original lender.  I know there's case law that -- I mean,

17   you've cited case law, but I just have a hard time believing

18   that's correct.  The argument is this:  Suppose that I find

19   out that my next-door neighbor has defaulted on his loan

20   and, therefore, the person who holds the mortgage could

21   foreclose on him.  So I bring a foreclosure action against

22   my neighbor saying I'm hereby suing to foreclose on your

23   home.  He literally can't say in defending or seeking to

24   enjoin the foreclosure Schiltz doesn't have my mortgage, he

25   has no right to be bringing this foreclosure action?  Your

1    argument is that he literally can't make that argument?

2    That's not a defense?

3            MR. GOERLITZ:  Of course, Your Honor, you are

4    taking the extreme to make a point.

5            THE COURT:  Yeah.  Yes, I am.

6            MR. GOERLITZ:  Here's my perspective as a lender's

7    counsel:  It's no surprise to the borrower who's

8    foreclosing.  On that notice of foreclosure sale set up by

9    the legislation they make it clear who's seeking to

10   foreclose.  They also make it clear who the servicer is of

11   your loan is.

12           One of my biggest frustrations in hearing these

13   cases is when the borrower says I have no idea who to talk

14   to, and I have no idea who to pay, it's somebody out there

15   has my mortgage and it's all a house of cards, that's

16   frustrating for me because we have all this Truth & Lending

17   Act about servicing mortgages and it's readily accepted in

18   the industry.  Everybody writes a check to a servicer.

19           THE COURT:  Mr. Goerlitz, I have a ton of these

20   cases.  They are as frustrating to me.  I am sick to death

21   of I only got three copies of my TILA notice, not four

22   copies.  But I have to say Mr. Mortner hasn't brought one of

23   these abusive sort of copy off the internet complaints.  He

24   has a theory.  It might be right.  It might be wrong.  It's

25   a very narrow theory.  It's a very clean theory.  I

1    understand his argument.  He's been, I think, very candid in

2    conceding that if certain facts are true, his theory won't

3    work.  So I totally get your frustration.  I feel a lot of

4    that often.  I almost weekly am getting two or three of

5    these mortgage cases, and I would say two-thirds or

6    three-quarters of them are basically taking complaints off

7    the internet and they are not true.  They are abusive.  They

8    are just designed to delay the day that the person gets

9    kicked out of their house.  This isn't such a lawsuit.

10         MR. GOERLITZ:  No, and if I gave that impression,

11   I didn't want to.  But my point, and in answering this

12   question about standing, is when you get this notice of

13   foreclosure sale, you should be able to tell on the face

14   whether it's relatively legitimate or not.

15         THE COURT:  Yeah.

16         MR. GOERLITZ:  And the reason for that is it gives

17   you a lot of information; the date of the mortgage, the

18   original amount, who the original mortgage holder was, who

19   the assignments were to, who your servicer is, the legal

20   description, all the statutorily-created information.

21         My argument on standing is, is you just can't say

22   that loan was transferred improperly.  You need something

23   more than that.  And something more would be I make my

24   payments to Bank of America, the servicer is Wells Fargo or

25   there's some missing link on that notice of sale that makes

1    it appear --

2              THE COURT:  Let me stop you, though.  Your point

3    you're just making here isn't that someone in Mr. Johnson's

4    position doesn't have standing to argue that the person

5    seeking to foreclose doesn't have the right to foreclose.

6    You're just saying he needs more detail or he needs a

7    legitimate argument.  But that's different than saying he

8    doesn't have the right to say the person who is seeking to

9    foreclose me, he doesn't have the right to do it because he

10   doesn't own my mortgage, he doesn't have legal title to my

11   mortgage.

12             MR. GOERLITZ:  And it goes to your extreme

13   situation where you don't have the legal right to foreclose

14   to say a borrower cannot contest that ever is, I think, an

15   extreme problematic situation.

16             Where borrowers don't have standing is when they

17   contest something relating to the foreclosure that is clear

18   on its face, such as here.  We have an assignment from MERS

19   to the trust.  They're saying it's wrong without any

20   additional information.  My perspective is that they don't

21   have standing to raise that argument just purely on its

22   face.  They would need more facts to show that somehow it is

23   wrong.

24             THE COURT:  Mr. Mortner hasn't just said there's

25   an assignment and it's wrong and told us nothing more than

1    that.  I agree the complaint is sketchy.  As I said, as an

2    original matter, I could make him amend the complaint.  But

3    his papers have certainly sketched out his theory.  His

4    theory is that the assignment of the mortgage -- that,

5    again, you need legal title to the mortgage to foreclose.

6    You didn't get it until February of 2011.  You didn't record

7    it until March of 2011, and that was an after-acquired

8    asset.  It's barred by the trust agreement.  It's void under

9    New York law and, therefore, you don't have a lawful

10   assignment.  He has a very specific theory.

11            MR. GOERLITZ:  And we have a very specific

12   response to that and that is under that theory they're not

13   saying that Wells Fargo does not meet Minnesota law to

14   foreclose.  They're saying that there's these other issues

15   with regards to the transfer between these parties that

16   somehow make it inappropriate under the law.

17            THE COURT:  No, they are saying that Wells Fargo

18   doesn't meet Minnesota law.  Minnesota law requires Wells to

19   have legal title to the mortgage, and he's saying you don't

20   have legal title to the mortgage.

21            MR. GOERLITZ:  That's not in the complaint I read,

22   though.  The complaint I read is that they are saying --

23            THE COURT:  I'm talking about what's in the papers

24   as a whole now.

25            MR. GOERLITZ:  Well, right.  Well, right.  So

1    their perspective is that I, as a borrower, should be able

2    to contest a transfer from MERS or throughout this whole

3    securitization process that I am not a party to, that I have

4    no evidence regarding any of these transfers, other than

5    basically the plain terms of the trust agreement.  They want

6    to contest issues between other parties.  I mean, what's

7    stopping people from saying that servicers are violating

8    terms of servicing agreements with Fannie Mae and Freddie

9    Mac that create defects in the foreclosure?  The point is

10   that --

11              THE COURT:  I agree with you in general that kind

12   of thing they wouldn't have standing to do.  But when the

13   defect is one that results in the person who's bringing the

14   foreclosure action not having the right to bring the

15   foreclosure action, I think they can challenge it.  Now,

16   like anybody bringing any kind of challenge, they do have to

17   have a theory.  They have to have some evidence, all that.

18   Your frustration seems to be more that the theory isn't

19   detailed enough or isn't explained as well in the complaint,

20   rather than the standing issue.  It just can't be that if

21   someone tries to foreclose on you and that person has no

22   legal right under Minnesota law to foreclose because they

23   never acquired legal title in the mortgage that you don't

24   have standing to make that argument.  You do have standing

25   to make the argument.  You have to make it well.  You have

1    to plead it correctly.

2           MR. GOERLITZ:  And I think it gets to the pleading

3    requirement, Your Honor, because they need to show a real

4    injury, not some fictitious or possible injury.

5           THE COURT:  Well, wait.  That's a whole different

6    issue.  I don't want you to bring that in.  We will talk

7    about that, the irreparable injury kind of thing.

8           MR. GOERLITZ:  No, I'm getting to as far as the

9    standing requirements.  In order to have standing, you have

10   to show a real injury.  You can't just show some potential

11   of an injury or some possible injury or some superficial

12   injury.

13          THE COURT:  Yeah.  If he wins, I enjoin the

14   foreclosure of his house.  If he loses, I don't enjoin the

15   foreclosure of his house.  He has a lot turning on that.

16          MR. GOERLITZ:  See, our perspective if he wins, we

17   can just turn around and foreclose in the name of MERS

18   because he's arguing that assignment is void.

19          THE COURT:  You could, but I don't think -- if

20   somebody brings a lawsuit and they will get relief from the

21   lawsuit -- that is, a harm will be prevented, and someone

22   else out there can do the same thing to them, I don't think

23   that means they don't have standing in the first lawsuit.  I

24   understand what you're saying.  I don't think it deprives

25   him of standing.  That's like, again, to take my

1    hypothetical, if I am foreclosing on my neighbor's house, I

2    don't think I can argue to the judge, Your Honor, if I don't

3    do it, his bank is going to eventually get around to doing

4    it, so he doesn't have any standing because if it's not me,

5    it's going to be the bank that forecloses on him.  I want

6    him out of here.  I want this thing to go faster.

7              MR. GOERLITZ:  I'm going to concede that it's a

8    very difficult argument that is very fact specific in each

9    situation.  In this situation, nobody is disputing that

10   Wells Fargo owns the note.  Nobody is disputing Wells Fargo

11   is getting paid.  Nobody is disputing --

12             THE COURT:  He does not concede that you own the

13   note.  He wants to see the proof.

14             MR. GOERLITZ:  Wants to see the proof.

15             THE COURT:  Right.

16             MR. GOERLITZ:  But he's not saying that -- the

17   flip side to this argument -- our perspective is if he wins,

18   his best day is somebody else forecloses because this is an

19   issue between the trust.  So it's not an issue --

20             THE COURT:  Same with my hypothetical --

21             MR. GOERLITZ:  -- and his mortgagor that nobody

22   can foreclose or that the wrong party is foreclosing because

23   they have no interest in this.  He is arguing, like they did

24   in the *Farmers Merchants* case that we cited, that this is a

25   dispute between corporations and I should have the benefit

1    of that dispute between the corporations.  And that case

2    specifically said that if there's a transfer between those

3    corporations, the borrower can't hang his hat on that.

4            THE COURT:  Yeah, but, see, the different -- I

5    think -- this is the *Rush* case, right, *Farmers*?  The *Rush*

6    case, as I read it, was an ultra vires case.  What the

7    person being foreclosed upon was saying or the person in

8    that position was saying was that the first bank, it was

9    ultra vires for them to transfer the loan to the second

10   bank.  But under Minnesota law, ultra vires acts are

11   enforceable.  If I, the corporation, sign a contract with

12   you and I'm acting in excess of my authority, you can still

13   enforce that contract.  It still exists.  *Farmers* has a line

14   in there about, yeah, there can be no doubt as to the

15   respondent's ownership of the note.  Here there is doubt.  I

16   mean, that's the claim.

17           Although Mr. Johnson didn't talk about it that

18   much in connection with the standing, in another of his

19   briefs he cited this case *Casserly v. Morrow*.  You probably

20   have memorized all these Minnesota mortgage cases.  *Casserly*

21   *v. Morrow* was a case where a guy owns land.  He executes a

22   mortgage to Minneapolis Threshing Machine Company.

23   Minneapolis Threshing Machine Company then assigns the

24   mortgage to Morrow, and Morrow forecloses on the mortgage.

25   And the landowner challenged based upon the validity of the

1    assignment.  It said the assignment from Minneapolis

2    Threshing Machine Company to Morrow was an unlawful

3    assignment, exactly as Mr. Johnson is saying that the

4    assignment from MERS to you was an unlawful assignment.  And

5    the Minnesota Supreme Court said that's right and it set

6    aside the foreclosure.

7            Now, if the landowner in *Casserly* has the

8    authority to sue to set aside the foreclosure based on the

9    invalidity assignment from the bank to Morrow, I don't know

10   why Mr. Johnson would not be able to sue to enjoin the

11   foreclosure based on the invalidity of the assignment.  It

12   seems like the same case to me.

13           MR. GOERLITZ:  Similar, but an important

14   distinction, the four corners of the assignment of mortgage

15   from MERS to the trust, nobody is disputing its validity.

16   What they are contesting is this agreement between all these

17   other parties, tax law and you know -- they are contesting

18   not the four corners of the assignment, which absolutely

19   they have standing to contest.  However, they want to

20   contest an agreement between parties that they're not a part

21   of, they have no relationship to, they have no interest in.

22           THE COURT:  And if that's all they were doing, I

23   think you would have a decent argument, but they have the

24   added thing of New York law because it violates that

25   agreement it becomes void.  If it was just violating the

1    agreement so all that would do is give the parties to the

2    agreement a right to sue each other, then I'd have some

3    sympathy for your argument.  But they are also bringing in

4    New York trust law, which is where the public kind of comes

5    in and says if it violates this trust agreement, not only

6    can people who are part of the agreement sue each other, but

7    it has no effect as law.  If the assignment has no effect as

8    a matter of law, you don't have the legal title and you

9    can't foreclose.

10        MR. GOERLITZ:  Well, again, if we look at the

11   assignment and look at the trust agreement, the trust

12   agreement specifically says you can hold the mortgage in the

13   name of MERS.  There's nothing in the trust agreement that

14   says that that assignment of mortgage is problematic.

15        THE COURT:  That's an argument on the merits,

16   though.  That's saying that they're wrong.  It's not saying

17   they don't have standing, that they're not allowed to make

18   the argument.

19        Your standing argument is that Mr. Johnson can't

20   make the argument, he has no right to argue that this

21   assignment was invalid.  I think he does have the right to

22   make the argument.  You in turn can respond that, well, he

23   has made the argument and he is wrong and here's why he is

24   wrong.  If you are right, then you win.

25        MR. GOERLITZ:  We're probably not going to agree

1     on this issue, but I think it's clear the law says there are

2     circumstances when a borrower does not have standing to

3     contest the foreclosure.  I think that's clear under *Jackson*

4     *v. Mers,* although they didn't specifically say it, and some

5     of the older Minnesota case laws.  So now it's for us to

6     figure out what cases apply and what cases don't apply.

7             Our perspective is if you're going to look at the

8     four corners of the assignment or you're going to look at

9     anything related to the foreclosure requirements, such as

10    that there is a default or that the mortgage or any

11    assignment thereof be of record and the other requirements

12    of, I think it is, 580.02, absolutely you have standing.

13            The situations you do not have standing is when

14    you get into issues that are not either related to the four

15    corners of the documents or to the statute, such as this

16    trust agreement.  And I think in this case you're saying

17    that I am arguing the merits, but the trust agreement is

18    part of the record, and the record says --

19            THE COURT:  No, you are misunderstanding.  I don't

20    think the argument is that it violates the trust agreement.

21    I think you may be right that if that's all they were saying

22    they would not have standing.  That's why the New York

23    statute is so important, because the New York statute says

24    if it violates the trust agreement as a matter of law, it

25    never happened, it's illegal, and then that's a different

1     order of argument.

2          The argument that Mr. Mortner is making is that

3     under New York law this was an invalid assignment.  And if

4     we start there and work backwards -- so it isn't just a

5     question of violating a private agreement between two people

6     who aren't the mortgagor.  It's an assignment that is

7     unlawful, is void under law, not just under contract, but

8     under statute.

9          MR. GOERLITZ:  Your Honor, I think you're reading

10    something into Mr. Mortner's argument that isn't there.  His

11    argument is that the transfer of this asset to the trust

12    violates New York trust law, not that the assignment of

13    mortgage violates New York trust law specifically.  He's

14    saying that the entire transfer of this loan to the trust,

15    which includes both the note and the mortgage, violates New

16    York trust law.

17         THE COURT:  I don't understand him to be making

18    that argument.  His argument focuses on what happens in

19    February 1st of 2011.  The loan wasn't transferred on

20    February 1st of 2011, legal title to the mortgage was.

21         MR. GOERLITZ:  Well, he's arguing that they both

22    are transferred.  That's the only way his argument prevails.

23         THE COURT:  He doesn't say anything about the loan

24    in his complaint.  That's your complaint about his

25    complaint, that he doesn't say anything about the loan.

1          Again, under Minnesota law the loan in a way is

2     irrelevant.  Under Minnesota law what you need to foreclose

3     is legal title, so his complaint focuses on legal title.

4          MR. GOERLITZ:  I'll just take you briefly through

5     my train of thought.  If we're sitting here today and we did

6     really violate New York trust law, that assignment of

7     mortgage is still of record.  It needs to be corrected.  So

8     legitimately we have a mortgage that was transferred.

9     Irregardless, it was transferred to this trust.  It doesn't

10    matter what date.  It was transferred to the trust.  We have

11    an assignment of mortgage that memorializes the transfer of

12    the mortgage to the trust.  Mr. Mortner's argument is that

13    entire transfer of the loan to the trust is invalid as a

14    matter of law, which means it needs to go back to the party

15    before it was transferred to this trust.

16          THE COURT:  You keep going back between "loan" and

17    "mortgage" and you're confusing me with that.

18          MR. GOERLITZ:  Sorry.  I'll start over.

19          So as we sit here there has been an assignment of

20    the mortgage.  And he appears to be conceding that this

21    trust has some sort of interest in this assignment of

22    mortgage.  His issue is that the interest they obtained

23    violates New York trust law due to the date it was obtained,

24    after the start-up date.  So if he's correct, the mortgage

25    assignment is still going to be of record.  It would either

1      need a court order that says that assignment of mortgage is

2      faulty or what would more than likely happen is the trust

3      would then assign that mortgage along with the note back to

4      the originating party because it was found as an invalid

5      transfer to the trust.  So we still have an assignment of

6      mortgage of record.

7              THE COURT:  I understand it would still be

8      recorded until it was taken off the records, which the court

9      would order it to be.  But if Mr. Mortner's theory is

10     correct, that assignment that happened in February of 2011

11     never happened.  It was void.  So the world would exist as

12     it existed on January 31st of 2011, which is MERS holding

13     legal title, you holding equitable title -- it wouldn't

14     entirely exist because there would have to be a lag while

15     the parties were ordered or the -- who is it, the recorder,

16     I forget who is the official who records it, but that would

17     have to change.  I don't remember what we were asking.

18              The bottom line here is I do think they have

19     standing to raise this particular argument in this

20     particular case, the argument being Wells Fargo never

21     acquired legal title to the mortgage, which under *Jackson*

22     they need in order to foreclose.  And the reason they didn't

23     acquire legal title is because MERS's assignment of that

24     legal title on February 1st of 2011 was void under New York

25     law.  I believe they do have standing to make that argument.

1      Okay.

2              Next and last issue I want to raise with you is

3      this irreparable harm argument.  There's two questions here.

4      One is do they have irreparable harm.  I'm not going to

5      issue any injunctions today.  Do they have irreparable harm

6      and do they have to plead irreparable harm.

7              Now, you say that in the complaint they have to

8      plead irreparable harm.  As I recall, you cited in support

9      of that CJS in a 1954 Georgia case, which always causes a

10     judge's eyebrows to raise because if something is true,

11     somebody should've said it since 1954.  So I'm not sure that

12     that's right.  Typically, when someone comes in on a TRO or

13     something like that, they just explain what the irreparable

14     harm is.  They give us an affidavit explaining the

15     irreparable harm.  I've never had a party say that it isn't

16     enough that there be irreparable harm, but you have to find

17     it in the complaint somewhere.  But in this case, I'm not

18     sure that matters because the irreparable harm being alleged

19     is the foreclosure on the home and that's in the complaint.

20     They say that the home will be foreclosed on.  So the

21     question is whether foreclosing on the home, the foreclosure

22     sale, is irreparable harm.

23              I did a little research yesterday and there's at

24     least a couple -- I didn't thoroughly research this, I just

25     spent about 20 minutes looking at it -- a couple Minnesota

1       appellate cases, one *Strangis v. Metropolitan Bank* that

2       says, "Respondents would suffer irreparable harm by the

3       foreclosure of the mortgage on their homestead.  Real

4       property is unique, which money damages may not adequately

5       compensate..."

6               And more to the point to your argument about the

7       redemption period there's a case called *Medin v. Liberty*

8       *State Bank*, M-E-D-I-N, 1990, Minnesota Court of Appeals

9       case, that says, In her affidavit Medin states that she will

10      be irreparably harmed if Liberty State is allowed to proceed

11      with the foreclosure sale because she will lose her

12      homestead and will incur substantial legal fees in an

13      attempt to reverse the foreclosure sale.  Given the wide

14      discretion accorded the trial court in determining whether a

15      temporary injunction should issue, We believe this

16      allegation is broad enough to imply her legal remedies are

17      inadequate because there is no evidence to suggest she could

18      procure the $50,000, plus costs, necessary to make a

19      redemption.  Medin's only other remedy would be money

20      damages, which are inadequate where real property is

21      involved.  So it sounds to me like -- again, this is based

22      on very quick research, though, but there is some Minnesota

23      authority for the notion that despite the existence of the

24      redemption period, a foreclosure sale does cause irreparable

25      harm to a homeowner.

1              MR. GOERLITZ:  Here's my perspective on that, Your

2      Honor, and I think it's well articulated in our brief, why

3      we don't think that's irreparable harm:  The first point I

4      want to make is it seems to me like TROs are granted

5      probably a little more willy-nilly than lenders would like

6      in the context of the foreclosures that we're seeing every

7      day.  And it is ultimately a discretionary issue.  And I

8      think that leaves then the Court of Appeals in a relative

9      bind to overturn on abuse of discretion the granting of a

10     TRO.  I haven't looked at those cases.  I am familiar with

11     *Strangis*, if that's how it's pronounced.

12              THE COURT:  *Strangis*.

13              MR. GOERLITZ:  My perspective is this:  At any

14     point from now to 100 years from now, presuming this case is

15     still ongoing, which we hope it isn't, but the Court can

16     issue an order voiding that foreclosure sale.  I don't have

17     the complaint in front of me, but I'm assuming their

18     allegations say foreclosure should be enjoined or any other

19     and further just relief as the Court deems just and

20     equitable.  I contest every single TRO at this procedural

21     posture because I see no harm to the borrower because they

22     can continue to live in the property during the litigation

23     while getting an order at some point in the future that says

24     our foreclosure is void as a matter of law.  So what we have

25     competing here is what does the possession of the

1    borrower -- how does that harm relate to having a

2    foreclosure sale.  Our posture to the Court and our argument

3    is that it doesn't harm the borrower at all.  They continue

4    to live there.  There's case law we've cited that says that

5    an eviction action at the end of the redemption period may

6    be automatically stayed while the lender is basically forced

7    to either incur all these costs on their own during this

8    six-month period or nine-month period or however long they

9    are enjoined from foreclosing while the borrower enjoys the

10   benefit of living in the property without us having any

11   ability to evict them during the lawsuit.

12            I haven't looked at the cases, so I'm speaking

13   blindly as to what they say, but I see no harm to the

14   borrower.  Whether the foreclosure sale happens on September

15   23rd or not, the status quo is Mr. Johnson continues with

16   the lawsuit.

17            THE COURT:  It's not quite that simple.  Suppose

18   you are living in a home that has been sold on a foreclosure

19   sale.  You're not just living there.  I mean, you've got to

20   make plans for your life, which may include buying another

21   house or -- I mean, it isn't just as simple as that.

22            The other thing is the logical implication of your

23   argument then is that -- to go back to my hypothetical where

24   I'm aware that my neighbor has defaulted on his loan and

25   that he could be foreclosed upon and I go ahead and bring

1   the foreclosure action -- that a court literally couldn't

2   enjoin my foreclosure action.  All the court could do is

3   later on make me pay damages to my neighbors.  I cannot

4   believe that a court would not enjoin that foreclosure

5   action.

6           MR. GOERLITZ:  See, I disagree with the

7   perspective, Your Honor, when you get to the point of they

8   only have damages essentially after the foreclosure sale

9   because, again, the court can always issue an order that the

10  foreclosure sale is void as a matter of law.

11          THE COURT:  Okay.  So in my hypothetical then

12  where you're my neighbor and I come in to foreclose on your

13  mortgage, I notice the foreclosure sale, I'm going to

14  foreclose on your home, a court literally can't stop it?

15  They can't stop it?

16          MR. GOERLITZ:  I'm saying --

17          THE COURT:  Is that right, that a court couldn't

18  stop me from foreclosing on you because you would not be

19  suffering any irreparable harm?

20          MR. GOERLITZ:  Correct.  You don't suffer any

21  irreparable harm until we try to displace you from the

22  property because, again, my theory is --

23          THE COURT:  I understand your theory.  By just

24  understand what you're saying, is today I try to foreclose

25  on your home --

1              MR. GOERLITZ:  Yep.

2              THE COURT:  I'm just the guy down the street.  I

3    don't own the mortgage.  I don't own the loan.  I don't own

4    anything.  I want your butt out of our neighborhood because

5    we've never liked you.  So I bring the foreclosure action.

6    Courts are hopeless to enjoin it because there's no

7    irreparable harm.  Does that sound right?

8              MR. GOERLITZ:  The court is helpless to stop the

9    sale, which is merely something of record with the county

10   recorder.

11             THE COURT:  There are certain things where that

12   just can't be the law, and it just can't be the law that if

13   I try to foreclose on my neighbor's home because I hear he

14   has defaulted on his loan that a court couldn't stop the

15   foreclosure sale.  I have to think they could, and I have to

16   think that's why there's these expressions in Minnesota law

17   that the foreclosure sale does inflict a type of irreparable

18   harm.

19             MR. GOERLITZ:  Okay.  And, again, this is a

20   discretionary view.  It's an equitable argument by the

21   district court.  Certainly if you come up with pretty

22   egregious facts, we probably can agree that no district

23   court judge is not going to grant a TRO.  What we have here

24   is no such thing.

25             THE COURT:  I know how that differs from my

1     hypothetical, but the point still is, is that if there

2     literally isn't any irreparable harm caused to the homeowner

3     by a foreclosure sale, then under my hypothetical the judge

4     could not foreclose the sale when I try to foreclose on my

5     neighbor.  I suspect most judges would find they have the

6     authority.

7             Now, you can argue that the judge should choose

8     not to exercise the authority in this case for other

9     reasons, but some irreparable harm has to exist for me to be

10    foreclosed when I try to foreclose on my neighbor.

11            Is there anything else you wanted to say,

12    Mr. Goerlitz?

13            MR. GOERLITZ:  I'm just curious, Your Honor, under

14    your fact theory, what is the irreparable harm because I'm

15    not seeing --

16            THE COURT:  The irreparable harm is the law views

17    someone's home differently than anything else.  The law has

18    always gone out of its way to protect peoples' homes in lots

19    of contexts, including things that have nothing to do with

20    this lawsuit, like the Fourth Amendment.  And when you

21    foreclose on my home, I'm in a position now where the clock

22    is ticking and I'm going to lose my place to live or at

23    least I'm in danger of losing my place to live.

24            And I suspect the reason why -- I read you the

25    cases where they say that there is irreparable harm is

1    because that's considered a threat to the special

2    relationship between a person and their home, the place they

3    call home.  That's why I suspect that Minnesota courts have

4    found irreparable harm in this context.

5         I understand the logic of your position, and I

6    even have some sympathy to it as an original matter.  I

7    suspect most judges would enjoin me in my hypothetical.  And

8    it's clear that other judges have enjoined not as egregious

9    cases, and I suspect that's what's behind it, the protection

10   of the relationship between a person and their home.

11        MR. GOERLITZ:  And, again, just to make my

12   argument clear, nothing has changed with regards to that

13   relationship between a person in their home, other than the

14   sheriff signing a document called a sheriff's certificate of

15   sale and putting it of record with the county recorder.  And

16   that borrower is not harmed because they still enjoy the

17   ability of that relationship to their home.  They can

18   continue to live there.  They can continue to live there

19   after the redemption period.

20        And the only way under your fact scenario they

21   ultimately don't enjoy that right to live in their house is

22   if they lose their case ultimately, because if they prevail,

23   that harm is extinguished and you record an order that says

24   that the foreclosure sale was null and void and they

25   continue to live in the house without changing their rights.

1          THE COURT:  Well, what happens under your view of

2     this when the redemption period is about to expire and the

3     homeowner, as is usually the case, doesn't have the money to

4     redeem it, which is also often the case, doesn't have money

5     to hire a lawyer, but in this case there is an exception?

6     We don't usually have an attorney of Mr. Mortner's quality

7     doing these cases.  When the redemption period is about to

8     expire and the underlying case hasn't been decided yet

9     because it takes judges sometimes months or years to decide

10     a case, at that point is the homeowner going to have

11     irreparable harm?

12          MR. GOERLITZ:  Yes.

13          THE COURT:  So even under your argument we're just

14     pushing back the injunction six months?

15          MR. GOERLITZ:  Correct.

16          THE COURT:  Instead of enjoining the sale, we just

17     enjoin this.

18          MR. GOERLITZ:  And that's why I argue it's not

19     ripe at this point in the foreclosure process.  It's only

20     ripe if we bring an eviction proceeding, which may never

21     happen and doesn't happen in many of these lawsuits.

22          Again, under my fact scenario, the court doesn't

23     grant the injunction.  We go to sale.  It starts the clock

24     of a redemption period; however, the borrower continues to

25     live there.  The redemption period expires.  The court has

1    the matter under advisement.  We don't commence an eviction

2    for three, four, five, six months, sometimes even a year

3    after the redemption period expires.

4         So my point is there is only irreparable harm the

5    second we take the keys out of their hand to the house,

6    which isn't happening and is speculative at this point

7    because our argument is no harm simply is occurring by the

8    sheriff's sale happening on September 23rd, and then no harm

9    even becomes ripe unless we commence a conviction.

10        There's case law -- the *Bjorklund* and the

11   *Nedashkovskiy* cases I cited -- that says the eviction shall

12   be automatically stayed if there's a pending court action,

13   so our hands may be tied.

14        THE COURT:  I'm not going to enjoin this because I

15   can't find a likelihood of success on the merits, so we

16   don't need to get into this argument.

17        Is there anything else more you wanted to say,

18   Mr. Goerlitz?

19        MR. GOERLITZ:  No.  I think I have every covered,

20   Your Honor.  I was just concerned about a ruling to the

21   contrary that could be said in the future.  Other than that,

22   I think I'm covered at this point.

23        THE COURT:  All right.  Thank you, Mr. Goerlitz.

24        Mr. Mortner, is there anything you wanted to add?

25        MR. MORTNER:  Yes, Your Honor, please.  Just

1      working backwards a little bit through the discussion that

2      has ensued, I would just further -- on the question of

3      irreparable harm, Your Honor, I think that Your Honor is

4      correct in his statements, what we might call, for lack of a

5      better word, a unique homestead doctrine that appears to

6      exist within the State of Minnesota, as well as throughout

7      the United States.  And I think that that concept finds

8      support in additional cases, not only the *Strangis* and the

9      *Medin* case, but in *Jackson* itself wherein the Supreme Court

10     said that we require exact compliance with the statute.

11            Let's remember that foreclosure by advertisement

12     is taking what used to be done previously in a judicial

13     proceeding, in which case the bank would be the plaintiff

14     and would have to prove standing, and allowing this

15     non-judicial proceeding, and hence the Supreme Court said we

16     require exact compliance with the statute.  And I think in

17     doing so what the court was saying was that we don't want

18     injury to homeowners for wrongful foreclosures resulting

19     from this liberalization, which is the notice by foreclosure

20     procedure.

21            So if the Court were -- and I can't imagine it

22     would -- were to find that foreclosure is not an irreparable

23     -- let's correct our language.  It's not irreparable harm.

24     It is threat of irreparable harm.  And that's an important

25     distinction when you start talking about what could happen

1    in the future.  Clearly there's a threat.  The fact that

2    there may be a right of redemption doesn't take away the

3    fact that there's a threat.  I want to make that point.

4         But if the court were to say that foreclosure did

5    not constitute a threat of irreparable harm, the language in

6    *Jackson* wherein the court requires exact compliance with the

7    statute would be rendered meaningless because --

8         THE COURT:  That comes up in a lot of our cases.

9    It gets cited a lot to us, that language.  My understanding

10   of that language, it's not focused on irreparable harm so

11   much as it's focused on that we're basically taking what

12   were traditionally judicial functions and putting them in

13   private hands and if we're going to do that, we're going to

14   make sure they follow to the letter the statute that does

15   that.  Now, underlying that, of course, there's the notion

16   that the stakes are high because we're talking about

17   people's houses, I'll grant you that, but I don't think it's

18   --

19        MR. MORTNER:  How do you, as you said, Your Honor,

20   make sure without judicial intervention?

21        THE COURT:  I expect that most judges if they

22   believed that there was a likelihood that the homeowner was

23   going to be able to prove that the foreclosure was unlawful

24   would enjoin the foreclosure and --

25        MR. MORTNER:  Exactly my point, Your Honor.

1          MR. MORTNER:  -- that's an implicit finding that

2     there's something irreparable about the harm caused by the

3     foreclosure.

4          So I'm not going to enjoin this foreclosure, not

5     because I don't think there's irreparable harm but because

6     for the reasons I've already described.  I can't find you

7     have a likelihood of succeeding on the merits of your

8     lawsuit.  I think you have an argument.  I think the

9     discovery may uncover that there is some argument there.

10    But based on the materials before me, it looks to me like

11    what will likely be the result of this lawsuit is a finding

12    that this loan was transferred to the trust at the beginning

13    of the trust and that the arrangements with respect to the

14    title on this MERS-held legal title were specifically

15    contemplated by the trust agreement so we don't have a

16    violation of the trust agreement, hence no violation of New

17    York law.

18         MR. MORTNER:  Your Honor, I can't disagree with

19    your statement of the law, but as far as your predictions, I

20    tend to think otherwise and it's because there are so many,

21    many cases in which the trusts do not have any evidence of a

22    valid transfer.

23         THE COURT:  And you might be right.

24         MR. MORTNER:  In fact, courts in some states said

25    we're putting the burden on the trust from the get-go

1   because you never come in here with it.

2          THE COURT:  I can't talk about trusts.  We have

3   lots of mortgage cases, and I can tell you in almost every

4   one of them the bank usually the bank's attorney has a

5   folder there in front of him and it has an original copy of

6   the note.

7          We get a lot of these ink signature cases where

8   someone alleges you can't prove that I -- give me the note

9   with my ink signature, and typically the bank has it in

10  front of them.  The bank says, Your Honor, here it is,

11  there's the ink signature.  At least in Minnesota we have

12  done a little bit better.  Typically, Wells Fargo and

13  U.S. Bank tend to be the two involved in the most

14  litigation, and they typically can put their hands on that.

15         That may be your experience and you may turn out

16  to be right in this case, but I just don't think at this

17  point I can find a likelihood that the bank will be unable

18  to show that it acquired the loan at the start-up of the

19  trust.

20         MR. MORTNER:  Well, Your Honor, I must remind you

21  that we do have before the Court today also a motion from

22  the plaintiff for temporary injunction.  Up until now, there

23  has not been a notice of foreclosure because Mr. Goerlitz,

24  pending today's argument, consented to adjourn it to

25  September 23rd, which is later this week.  As of yet he has

1   not consented to adjourn it further than that.  So,

2   therefore, I do have to ask the Court that we do have a

3   temporary injunction pending the final determination of

4   these motions in order to maintain the status quo.

5         THE COURT:  Mr. Mortner, I don't think I can give

6   you that temporary injunction for the reasons I've stated,

7   which I won't go through it all again.  I don't think

8   sitting here I can find that you have a reasonable

9   likelihood of succeeding on the merits of your lawsuit.

10   Without that reasonable likelihood, I don't think I can

11   grant the temporary restraining order.

12         I would like it if Wells would -- because I

13   believe that we can get the discovery done and this thing

14   teed up pretty quickly, it would be nice if Wells would give

15   us a little more time before going forth with the

16   foreclosure sale, but I don't think I can enjoin the

17   foreclosure sale.

18         MR. MORTNER:  Well, Your Honor, I beg to just

19   object and differ because I think that Wells certainly had

20   every opportunity here.  They came in to this motion saying

21   you must accept our pleadings as true.  That was the

22   argument that they made.

23         THE COURT:  They are right on a judgment on the

24   pleadings, which is what you captioned your motion and how

25   you describe your motion in the first sentence.  They do

1       have to accept the pleadings as true.

2              MR. MORTNER:  We also had Rule 26 disclosure.

3       They are saying the fundamental fact of their case is that

4       they had a proper negotiation of the note in 2007 and yet

5       they offered no evidence of that in their Rule 26

6       disclosure.  So having done that, I don't think it's fair to

7       say that we haven't shown a likelihood.  They had a duty to

8       provide that evidence; they haven't done so.  So, at the

9       very least, the Court should maintain the status quo.

10             THE COURT:  All right.  I disagree with you on

11      that.

12             Is there anything else you wanted to say,

13      Mr. Mortner?

14             MR. MORTNER:  Just a couple other things, Your

15      Honor, if I may.

16             On this question of standing to raise the issues

17      pertaining to the relationship of MERS and Wells Fargo, I

18      think the Court is absolutely correct in its analysis of the

19      issue.  I would just point out -- you mentioned that Wells

20      Fargo has offered some law in support of their position that

21      there is no such standing, and specifically what they

22      offered was a case titled *Carpenter*, the Artisans Savings

23      Bank.  Our position is that that case is in a posit because

24      in that case --

25             THE COURT:  That's where the legal title holder --

1    the person who had equitable -- they proceeded in the name

2    of the legal title holder?

3              MR. MORTNER:  That's right, Your Honor.

4              THE COURT:  It's the other case I was thinking of,

5    the *Rush* case, which I explain.  I believe the *Rush* case is

6    an ultra vires case, is what I believe it is.  I think it's

7    a little different than the case that you're raising here.

8              MR. MORTNER:  Well, then I think we have no

9    further things to say, other than I would also echo the

10   Court's request that defense give us a little bit more time

11   and continue adjourning the notice so that we can finish

12   fleshing out this case.

13             THE COURT:  Okay.  Thank you, Mr. Mortner.

14             I'm not going to take the time to write an

15   opinion.  I think I have made my views on all these issues

16   pretty clear and, therefore, I'm going to deny all the

17   motions pending before me.  I don't believe I can give the

18   plaintiff either summary judgment in part because I don't

19   think it was a properly set up summary-judgment motion for

20   the reasons I've described.  It was set up and understood by

21   Wells Fargo as a motion for judgment on the pleadings.  I

22   certainly can't grant judgment on the pleadings for the

23   plaintiff because I have to take the allegations in Wells

24   Fargo's answer as true.  So I can't grant any judgment for

25   the plaintiffs.

1          I also don't believe I can grant a temporary

2     injunction to the plaintiffs because, for the reasons I've

3     described, I cannot find that they have a substantial

4     likelihood of success on the merits.

5          As to Wells's motion to dismiss, I disagree with

6     the motion insofar as it relies on the failure of the

7     complaint to talk about the loan or the failure of the

8     complaint to talk, or talk more, about irreparable harm.

9          I do think Wells is correct that it was entitled

10    to more information in the complaint about why the February

11    transfer or assignment of legal title to the mortgage

12    violated the trust agreement, but Wells since has gotten

13    that information.  To make the plaintiff amend the complaint

14    simply to tell Wells something it already knows at this

15    point I think would just be a waste of all of our time and

16    the parties' money.  So I'm going to deny that motion as

17    well.

18          What I would ask you, as I have talked to you

19    about, talk to you each other now after I leave.  Figure out

20    how you can most quickly, and efficiently, and cheaply get

21    the information about the loan from Wells to the plaintiff.

22    Once Mr. Mortner has that information -- if you believe,

23    Mr. Mortner, that you still have a basis for challenging

24    Wells's standing to foreclose, you can bring a motion and

25    I'll try to get you in here quickly on that.  If Wells shows

1    you to your satisfaction that it did properly acquire the

2    note back at the start-up of the trust, then you should

3    dismiss your lawsuit.  But, you know, as we've talked about

4    at length today, this is all going to turn on the loan and

5    Wells's acquisition of the loan as trustee for the trust.

6    That information is presumably easily accessible to Wells

7    and easily communicable to the plaintiff.  And so if you

8    guys could work together to get that done quickly and

9    efficiently, we can get this case resolved one way or the

10   other.

11          All right.  Thank you, gentlemen, for your help

12   with the case.  As I said, please talk to each other about

13   how we can most quickly get the case resolved.

14          THE CLERK:  All rise.

15          (Court adjourned at 10:05 a.m.)

16                    *      *      *

17

18          I, Debra Beauvais, certify that the foregoing is a

19   correct transcript from the record of proceedings in the

20   above-entitled matter.

21

22          Certified by:   s/Debra Beauvais
                            Debra Beauvais, RPR-CRR
23

24

25