**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Civil No. 11-CV-01254 PJS/JJG**

---

Michael H. Johnson, Jr.,

Plaintiff,

v.

Wells Fargo Bank, N.A., as trustee for the
Holders of the SASCO 2007 MLN1 Trust
Fund,

Defendant.

---

**AFFIDAVIT OF DR. KENNETH EUGENE LEHRER**

**THE STATE OF TEXAS     )**
                                     **) ss.:**
**COUNTY OF HARRIS       )**

BEFORE ME, the undersigned authority, on this day personally appeared Dr. Kenneth Eugene Lehrer who, after being duly sworn, upon his oath stated and deposed as follows:

1.     My name is Dr. Kenneth Eugene Lehrer.  I am over the age of 21 and I am fully competent to make, and not disqualified by law from making, this affidavit.  All of the statements set forth herein are based on information and documents provided to me as well as my years of training and experience, they are within my areas of expertise, and they are within my personal knowledge and are true and correct.

2.     As part of this affidavit is my preliminary expert report, along with a statement of my qualifications and credentials and other supporting data as required under

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../......

PAGE 2.

the Federal Rules of Civil Procedure. All of these documents were prepared by me, and are my work.

3.      I hold four (4) degrees from New York University ("NYU"), including a Bachelor of Science degree in Finance (B.S. - 1967), a Masters in Business Administration degree in Banking (MBA - 1969), a Master of Arts degree in Economics (M.A. - 1972), and a Doctorate in Urban Economics (DPA - 1980).

4.      I am a member of the following organizations:

·        National Association of Business Economists,
·        American Academy of Economic and Financial Experts,
·        American Law and Economics Association,
·        Houston Business Economists,
·        National Association of Forensic Economists,
·        American Economic Association,
·        North American Economics and Finance Association,
·        Southern Economic Association,
·        Western Economic Association, and
·        The Finance Club and Money Marketeers, both
         affiliated with New York University.

5.      I am the holder of a Texas General Real Estate Appraisers License (License No. TX-1337797-G) and the holder of a Texas Real Estate Brokers License (License No. 0256992) and I am also registered with the Securities and Exchange Commission as an Investment Advisor under the 1940 Investment Advisors Act.

6.      I have taken and successfully competed two (2) courses on Mortgage Securitization (Mortgage Securitization Auditor and Ambassador Mortgage Securitization Auditor [MSA Tier 2]) offered by Certified Forensic Loan Auditors.

7.      During the course of my business career that commenced in June 1970, I

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../......

PAGE 3.

have served as a banking officer at Bankers Trust Company, a significant commercial bank in New York City (subsequently sold); have been an officer and corporate director for numerous companies engaged in the overall stream of business and commerce; served as a member of the Grand Jury of the State of New York; served as Chairman of the Board of Directors of four (4) Savings and Loans for the Federal Home Loan Bank of Dallas (Dallas, Texas) that had been declared insolvent and placed under the care and operation of the FHLBB and I have served in various other capacities for other organizations of the United States Federal Government.

8.     For approximately twenty years (1984 – 2002) I served as an Adjunct Professor of Real Estate and Finance at the University of Houston, Graduate School of Business Administration on a continuing basis. I presently serve as an Adjunct Professor of Finance and Economics at the University of Phoenix (Houston Campus). As part of my teachings, especially for the time at the University of Houston, the concepts of mortgages, mortgage financing and mortgage securitization were an integral part of the real estate course curriculum.

9.     I am a practicing economist who specializes in the preparation of institutional reports, real estate studies and business valuations that includes – business valuations, fairness and solvency opinions, advisory opinions, market and feasibility analysis, loan presentations for financial institutions, investment analysis and business plans in the financial area. Approximately 2/3rds of my time is spent on non-litigation activities.

10.     I have performed similar financial / banking / economic analysis as to the

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../.....

PAGE 4.

one performed in the present case.

11. I have served as an expert witness in approximately 1,700 cases in the State of Texas and throughout the nation in State and Federal District Courts over the past twenty – eight (28) years concerning disputed issues involving business formations, contractual disputes, banking, fraud, lost profits, due diligence, standards of care in banking, real estate, real estate development, mortgages, mortgage financing, finance, securities, stocks and other related economic and financial matters. I have direct personal and expert personal knowledge, training and experience in the granting of loans and financings and operation of commercial banks and real estate investment operations in many areas of the United States since 1970.

12. The data, thoughts and opinions expressed herein below are from an economic / finance / banking and real estate point of view and are not legal interpretations or conclusions, as the undersigned is not an attorney, but is relying upon his – education, background and experience of the generally accepted policies, practices and procedures of - real estate lending, banking and finance.

13. Commencing in the 1930s home mortgages were basically funded by local or regional banks as per criteria of the Glass-Steagal Act. This Act was partially repealed in 1999 when the Gramm-Leach-Bliley Act (also known as the Financial Services Modernization Act of 1999) was enacted. This Act repealed parts of the Glass-Steagal Act of 1933 by removing barriers in the market among banking companies, securities companies, and insurance companies that prohibited an institution from acting as a

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../.....

PAGE 5.

combination of an investment bank, a commercial bank and an insurance company. With the passage of the Gramm-Leach-Bliley Act, these types of institutions were allowed to consolidate.

14.     Mortgage lending changed as Trusts and Trust Funds came into being on Wall Street. These funds were to be supplied with residential mortgage loans that would provide a steady flow of income to investors who purchased Mortgage Backed Certificates (also often referred to as "MBS" [Mortgage Backed Securities]) representing a portion of the Trust Fund Mortgages, but not any one or specific individual mortgage. These certificates were not mortgages themselves, but were pieces of various mortgages at different levels ("tranches").

15.     Stocks and bonds are known as securities. The process of taking a created loan, selling it, pooling it, and placing it into a trust fund that is traded on a securities exchange and dividing the fund into many negotiable pieces (namely, the securities that investors purchase) is known as Securitization. Securitization is the term for turning a financial instrument into a security (usually negotiable) namely a stock or a bond or a hybrid creation.

16.     Many securitized trusts tried to circumvent filing and recording of land documents in the various county land records by utilizing the Mortgage Electronic Registration Systems ("MERS") to track and transfer notes and operate as their nominee or agent. MERS is a private, member-only club initially created by banking institutions who claimed that an electronic database system (similar to the "DTC" [Depository Trust

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../......

PAGE 6.

Corporation]) would streamline the tracking and transfers of loans.

17.    Securitization steps to be proper and accurate require the following chain involving the debt and mortgage instruments :

> The Borrow to
>> The Original Lender to
>> Sponsor/Seller to
>>> The Depositor to
>>>> The Trust

18.    The Sponsor / Seller Group was really more like the Purchaser ("acquirer") for the Trust and a seller to the Trust Fund all at once and at the same time. In the 2000's, mortgage Bankers, Brokers and a variety of lending institutions (often called originators and warehouse lenders) were granting and closing home mortgage loans in a sustained rapid fashion by selling them to Sponsor/Sellers. The various Sponsor/Sellers supposedly undertook their "due diligence" to be assured the instruments ("paperwork") fulfilled the requirements of the Trust and were then selling these loans to the Depositor - a middle man in the overall plan of the Securitization process. The Depositor would further supposedly review the instruments ("paperwork") and sell the mortgages to the Trust. The Trust utilizing the mortgages as collateral would file the appropriate documentation, including a Prospectus (424-B5) with the Securities and Exchange Commission ("SEC") and issue certificates to be sold to institutions and the general public, at the closing of the Trust.

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../......

PAGE 7.

19.    MERS provides services to its member organizations by allowing them
access to their online systems and by letting those members, under the name of MERS, do
their own transfers and tracking. These MERS members can even initiate assignments to be
recorded when a foreclosure process needs to be executed. The member organization needs
to designate an employee within their company to be an authorized agent or even Vice
President of MERS and they proceed to undertake their own tracking, transferring, and sign
official documents as if they were actually an employee of MERS and while actually being
employed by the member organization. Often these members are not the holders of the note
and they are actually the servicers, who hold no beneficial interest in the note. These
servicers log onto the MERS system, and prepare an assignment which they record at the
county. The servicer will represent themselves as the Assignor denoting they are a vice
president or authorized agent of MERS and assign the mortgage to themselves. There is no
real regulation or oversight of this MERS system utilized by the banking industry.

20.    Lenders, investors and servicers can become members of MERS however
borrowers are not allowed. Thus, MERS can be compared to a private club, where only
certain members have access to specific information. Thus, MERS regardless of how
authorities constituted same, it cannot replace the public land records system as borrowers
would lose track of who holds their debt and to whom they are indebted. They cannot
confirm for themselves the mortgage or deed of trust recorded with the public land records
has been kept with the note throughout the tracking and transferring done by MERS. This
is because within MERS membership group, members do not have to record an assignment

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../.....

PAGE 8.

each time they transfer the note.

21.    In the absence of Assignments in conjunction with the sale of a note (depositor, sponsor, and Trustee) this does not allow for independent verification that a note was sold into a Trust within the time frames allowed. Thus, any failure to deliver the Deed of Trust or delivery of the Deed of Trust without its Assignments as regulated by Trusts in general could be a void act for the reason that it violated the express terms of the Trust instrument.

22.    The trust agreement which created the Trust in Securitization matters is called a Pooling and Servicing Agreement ("PSA") and is filed with the Securities and Exchange Commission and is available through the SEC website at SEC.gov. The Trust agreement is usually filed as exhibit to Form 8-K with the SEC and there is also an additional agreement for the sale of mortgage loans called an "Assignment and Assumption Agreement" that is also usually filed as an exhibit to the 8-K filed with the SEC.

23.    The Trust agreement (also known as and referred to as the PSA) sets forth how the trust acquires its assets. The Trust agreement sets forth both powers and the limits of the powers of the Trust. The Assignment and Assumption Agreement is incorporated into the Trust Agreement.

24.    The PSA and the Assignment and Assumption Agreement when read together require that each party to the sale of the mortgage loans endorse each promissory note to the next party in the chain of title until the promissory note is endorsed to the Trustee for the benefit of the Trust. This requirement is included in the Assignment and

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../.....

PAGE 9.

Assumption Agreement and also in the PSA.

25.    The PSA constitutes a warranty by the Depositor that at the time the
Depositor sold the assets to the Trust the Depositor was the owner of the assets. The
industry standard, custom and practice would have required under the terms of a PSA which
the parties chose was at the very least the promissory notes which constituted the assets of
this Trust be endorsed through the chain of ownership to the Depositor by the Closing Date
of the Trust. Without such endorsements on the promissory note it is totally uncertain who
actually owned the note and at what time, different parties might have owned the note, if
any.

26.    The PSA required three (3) different certifications in the PSA which were
made by the Master Document Custodian to the Trustee that all of the mortgage loans
purchased by the Trust were present and that each promissory note contained every
endorsement that was required by the agreement including a specific endorsement to the
Trust.

27.    If a promissory note was acquired by a Trust after the closing date as there
are express limitations on the right of the Trust to act. The PSA expressly states that the
Trustee shall not accept any contribution of assets to the Trust unless the Trustee shall have
obtained an opinion of counsel that the contribution will not cause any REMIC to fail to
qualify as a REMIC or subject the Trust Fund to any Federal Tax on "prohibited
transactions" that are defined under the Tax Code. These types of limitations are common
and are present in every Pooling and Servicing Agreement that seeks to create a securitized

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../.....

PAGE 10.

trust that can claim the tax benefits of REMIC status under the United States Tax Code. In
the industry, Pooling and Servicing Agreements are principally designed to protect the
certificate holders (the investors) by expressly limiting the Trustee's powers so that the
Trustee does not cause the investors to incur a substantial tax penalty as a result of a mistake
on the Trustee's Part.

28.     In fact, in a PSA there are set forth further explicit restrictions on the powers
of the Trustee and the Master Servicer that prohibits either of them from acquiring any
assets beyond the closing date of the Trust without a proper opinion of counsel that such an
acquisition would not violate the REMIC provisions of the Tax Code. These types of
limitations are common and are present in every Pooling and Servicing Agreement that
seeks to create a securitized trust that can claim the tax benefits of REMIC status under the
United States Tax Code.

29.     No entity can be a creditor if they do not hold/own an asset (i.e. the Note
and/or the property); a Mortgage Pass Through Trust (i.e. R.E.M.I.C., as defined in Title 26,
Subtitle a, Chapter 1, Subchapter M, Part II §§ 850-862) cannot hold assets, for if they do,
their tax exempt status is violated and the Trust itself is void ab initio. If a Trust holds an
asset, either the Trust has voided its intended Tax Free Status, or the asset is not in fact
owned by the Trust.

30.     The language of a Trust does not allow for any one participant in the trust to
have actual ownership of a note. Once a note is converted into a stock, or stock equivalent,
it is no longer a note. If both the note and the stock, or stock equivalent, exist at the same

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../......

PAGE 11.

time, this is known as double dipping. Double dipping is a form of securities fraud. Once a

loan has been securitized, it forever loses its security component (i.e., the Deed of Trust),

and the right to foreclose through the Deed of Trust is forever lost.

31.     In addition, once a loan is securitized, the Promissory Note has been

converted into a stock as a permanent fixture. It is now a stock and governed as a stock

under the rules and regulations of the SEC; hence, the requirement for the filings of the

registration statements, Pooling and Servicing Agreements, Form 424-B5 and other

documentation.

32.     As a general summary of Securitization, the sale and collection of mortgages

into a pool for securitization represents a totally different type and style of mortgage lending

than had been undertaken in the United States for over seventy-five (75) years.

Securitization, while it can add some depth and breath for the financial industry, it cannot

set aside generally accepted rules, regulations and operational processes. In regards to the

specific case and matter at hand, and based upon the above general outline and background

of mortgage securitization over the past 10-15 years, and research into the Michael H.

Johnson loan having been personally undertaken by the undersigned and those whom the

undersigned personally engaged to act upon his behalf to obtain additional information from

the Bloomberg Data System (Note: you need to be a subscriber to obtain this information),

upon which the undersigned has personally reviewed and personally relied upon, the

following is noted:

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../.....

PAGE 12.

a)   The research denotes that the Trust that Wells Fargo claims to be the Trustee for, namely **SASCO MLN1 2007** does not exist as an entity.  Albeit, research shows there is extant a mortgage backed securities trust titled **MLMI MLN1 2007,** for which Deutcshe Bank USA acts as Trustee.  The moniker **SASCO** is intended to indicate that a trust was formed or "issued" by Structured Asset Securities Corporation.  The moniker **MLMI** is intended to indicate that a trust was formed or "issued" by Merrill Lynch.

b)   The Johnson loan was, in fact, transferred into the **SASCO MN1A 2007 Trust**. Presuming (**not known** at this time) the loan was correctly transferred as outlined above, therefore, only a Trustee acting on behalf of that Trust, not on behalf of another Trust, has the power to foreclose, if any power exists at all.  Any lack of the power to foreclose by **SASCO MN1A 2007 Trust** rests upon a combination of proper document transfer.

c)   Wells Fargo Bank, as Trustee for **SASCO MLN1 2007,** is not the Trustee for the "new" or "current" Trust that holds the Johnson loan.  In the capacity of Trustee for **SASCO MLN1 2007**, Wells Fargo lacks the power to foreclose.

d)   In conclusion, the research denotes there is a Trust **SASCO MN1A 2007 which was the transferee of the Johnson loan.**   Parenthetically, the research denotes that Wells Fargo Bank, NA is also the trustee of **SASCO MN1A**

AFFIDAVIT OF DR. KENNETH EUGENE LEHRER - JOHNSON VS. WELLS FARGO BANK
AUGUST, 2012
CONTINUED ..../.....

PAGE 13.

2007, thus, in that capacity, Wells Fargo "might" have the power to foreclose the Johnson loan, depending upon how that Trustee received the Johnson loan and if the loan was transferred correctly (as outlined above), but Trust **SASCO MN1A 2007** has not claimed to own the loan and is not seeking to foreclose, and hence the Johnson loan should not be foreclosed upon, especially by a party that has neither interest nor standing in the securitized instrument, *i.e.,* **SASCO MLN1 2007**.

Further affiant saith not.

Dr. Kenneth Eugene Lehrer

SWORN AND SUBSCRIBED TO before me on this $8$ th day of August, 2012.

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

DONNA BYBEE
Notary Public,
State of Texas
Comm. Exp. 04-11-13